IN MATTER OF DISCIPLINARY PROCEEDINGS AGAINST SEDOR, Attorney at Law.

*No. 75-207-D. Argued September 7, 1976.—*
*Decided October 5, 1976.*
(Also reported in 245 N. W. 2d 895.)

630

For the Board of State Bar Commissioners there was a brief and oral argument by *Robert H. Bichler* of Racine.

For Gilbert Sedor there was a brief by *Frank D. Hamilton, Roger J. Mueller* and *Hamilton & Mueller* of Dodgeville, and oral argument by *Frank D. Hamilton.*

PER CURIAM. The Board of State Bar Commissioners (hereinafter the Board) filed a complaint in this court seeking disciplinary action against the defendant, Gilbert Sedor, on July 14, 1975. Defendant's answer was filed on August 5, 1975. The court appointed the Honorable W. L. JACKMAN of Madison, Wisconsin to serve as referee. The referee made his findings, conclusions and recommendations on February 15, 1976 and the same were filed

with this court on February 20, 1976. The referee recommended that the defendant be given a strong reprimand and be required to pay the costs of this proceeding.

In June of 1974, the defendant, with and at the invitation of a client, Kenneth R. Sundseth, loaned the Roadmaster Body Corporation $25,000. At the time Roadmaster was represented by another member of the defendant's firm. The agreement called for the repayment of the principal at ten and one-half percent interest, execution of a security agreement, and in addition a payment of $78,000 to the defendant and Mr. Sundseth payable over 78 months. At approximately the same time, the defendant undertook legal representation of Roadmaster. Roadmaster subsequently went into bankruptcy. The circumstances of the loan, the defendant's efforts to protect it while representing both Roadmaster and Mr. Sundseth and his own participation in the loan constitute the basis of the complaint by the Board.

Roadmaster, which manufactured and repaired truck bodies in Janesville, Wisconsin, was represented prior to the loan by attorney Robert Consigny who along with the defendant was a member of a law firm operating as a service corporation in Janesville.

Roadmaster was in serious financial difficulty from the start and had difficulty in obtaining financing. Mr. Larry B. Miller and Mr. Richard C. Entwistle, stockholders and the principal officers of Roadmaster turned to Mr. Sundseth, a local investor and businessman, for help. Mr. Sundseth was a client of the defendant and told them to see the defendant to draft a proposal. There then commenced a series of meetings between June 6, 1974 and June 14, 1974. On June 6th, Messrs. Miller and Entwistle met with the defendant. There was disagreement over the terms as each had interpreted them after talking with Mr. Sundseth who was not present at the meeting. Nevertheless, at this meeting, $5,000 was furnished to

Roadmaster to meet a payroll. It was at this time that the defendant advised Messrs. Miller and Entwistle that they and their wives would have to personally guarantee the loan. Mr. Sundseth invited the defendant to participate in the loan and the defendant, using his own line of credit at a bank, actually raised the money. The defendant and Mr. Sundseth participated on an equal basis, with Mr. Sundseth giving to Mr. Sedor his personal note for $12,500. The final understanding about the terms occurred on June 11, 1974. Roadmaster was to pay the defendant $1,000 a month to be applied on the $25,000 loan plus ten and one-half percent interest until such principal and interest were paid in full. In addition, Roadmaster was to pay $1,000 a month for 78 months commencing August 6, 1974 to the defendant and Sundseth ($500 to each). It is clear from the record that the only consideration for this $78,000 payment was the granting of the loan. The agreement further provided that the corporation would authorize the execution of security agreements covering various assets of the corporation. In addition, Mr. Sundseth was to be put on the board of directors and the defendant given an option to be a member if he wished. The defendant and Mr. Sundseth were given an option to buy five percent of the outstanding stock of the corporation.

At the time this agreement was presented, Mr. Miller expressed dissatisfaction but later testified, "I felt that we were over a barrel and we already had $5,000, we spent it, and we had no way to return it at that particular point." The defendant advised Messrs. Miller and Entwistle of his proposed participation in the loan and they expressed no objection. The loan agreement was signed on June 14th but Mr. Miller again objected to its terms. The defendant testified at the hearing before the referee:

"I was a little bit disturbed, this is late in the afternoon and it must have been close to 6:00 by the time Mr. Miller finally came. He wasn't ready to sign, he had some further questions. I simply said, 'Look, if you want to have another attorney look at this, if you want to retain another attorney, feel free to do so, go get somebody else. I have no objection to that, I am in no hurry. In fact, if that is the circumstance I would just as soon get out of this transaction.' Some statement was made again about the funds being delivered that day and the payroll having to be met and things of that kind and Mr. Miller made the statement, 'Well, the attorney we would probably go to would be Mr. Consigny in your same office, so what is the difference,' and went ahead and signed the agreement. I delivered the two checks to him and left."

The record does not reveal the precise date when the responsibility for representation of Roadmaster shifted from Mr. Consigny to the defendant. It is clear from the record that the defendant represented Mr. Sundseth during the negotiations and that the defendant asked Mr. Consigny about the financial condition of Roadmaster on June 5th. Sometime in the summer of 1974, Mr. Consigny testified, he was made aware that the defendant was doing work for Roadmaster. In September he received a note from the defendant that the defendant would be handling the Roadmaster account and that Mr. Consigny should prepare a final bill for his work. The defendant billed Roadmaster beginning August 22, 1974 for professional services.

Roadmaster paid its July installment on the note late and paid nothing in August and September. Starting in August, an attempt was made to sell Roadmaster to a Pennsylvania firm and the defendant was active in these negotiations. The negotiations with the Pennsylvania company broke down on September 18, 1974 and on the same day, the defendant executed an affidavit of attachment and a bond in support of attachment of Road-

master's assets. The affidavit claimed a debt of $103,000, the $25,000 note plus the $78,000 payment that was to be made under the contract. In the attachment affidavit, the defendant stated that he "Has good reason to believe that the defendants have assigned, conveyed, disposed of or concealed, or are about to assign, convey, dispose of or conceal their property or some part thereof in an attempt to defraud their creditors." The defendant also billed Roadmaster for services rendered on this date.

Messrs. Entwistle and Miller also testified that one or two days after the writ of attachment was served the defendant proposed to pay each of them $10,000 "under the table" in return for letting the defendant take the assets of the corporation. The defendant denied he made such a proposal.

Roadmaster and Messrs. Miller and Entwistle finally retained new legal counsel and served an answer and counterclaim in response to the complaint of Mr. Sundseth and the defendant. That case is before us on several issues and is the subject of a separate opinion.[1] Subsequent to the retention of new counsel by Roadmaster, Miller and Entwistle, the defendant went to the Roadmaster office and confronted Messrs. Miller and Entwistle in an acrimonious meeting concerning the suit.

In October of 1974, Roadmaster filed a voluntary petition in bankruptcy. Mr. Sundseth and the defendant filed in the U. S. District Court for the western district of Wisconsin a claim for $25,000 plus interest, less the $1,000 payment. In liquidating the assets of Roadmaster, the trustee in bankruptcy realized approximately $42,550 on the sale of the assets. The defendant and Mr. Sundseth settled their security interest lien for $15,000 and received in exchange a release of all claims by Roadmaster against the defendant and Mr. Sundseth.

[1] *Sundseth v. Roadmaster Body Corp.*, 74 Wis. 2d 61, 245 N. W. 2d 919.

Based on the complaint and the testimony, the referee in the disciplinary matter found a violation of the Code of Professional Responsibility and recommended discipline in the form of a strong reprimand and payment of costs. The referee made the following conclusions of law:

"(1) The agreement (plaintiff's Exhibit 3) contemplating ultimate payment of $103,000 for a loan of $25,000 was usurious, and in addition unconscionable.

"(2) Sedor owed a duty both to Sundseth and to Roadmaster, Miller and Entwistle to advise them that the agreement was usurious and unconscionable. His failure to do so violated Code, EC 6–4.

"(3) Sedor's participation in the usurious loan was a violation of Code, DR 5–101, DR 5–104.

"(4) After Roadmaster's default on August 6, 1974, on repayment of the loan, Sedor's continuing representation of Roadmaster, Miller and Entwistle as well as Sundseth violated the Code, DR 5–105.

"(5) The attachment proceeding and the affidavit in support were an abuse of process and a violation of Code DR 1–102(A) (4).

"(6) Sedor's conference with Miller and Entwistle after he had received Kolb's notice of retainer was a violation of Code, DR 7–104(A) (1)."

Other findings were made by the referee in favor of the defendant and will be discussed in this opinion.

■■ In this original action this court must look to the record *de novo* to determine whether the facts warrant discipline or suspension. *State v. Weber* (1972), 55 Wis. 2d 548, 553, 200 N. W. 2d 577. The action is civil. *State v. Postorino* (1972), 53 Wis. 2d 412, 417, 193 N. W. 2d 1. The state has the burden of showing a violation of the Code by clear and satisfactory evidence, which is the middle burden of proof. In *State v. Preston* (1968), 38 Wis. 2d 582, 588c, 157 N. W. 2d 615, 159 N. W. 2d 684, certiorari denied 393 U. S. 981, 89 Sup. Ct. 452, 21 L. Ed. 2d 442, this court said:

"A disciplinary proceeding is brought as an original action in this court, and the function of the referee is that of a special master appointed to conduct a hearing under the jurisdiction of this court. While the recommendations of the referee are given consideration, we look to the record and transcript to determine whether the facts apparent therein warrant some form of discipline. To evidence revealed in the record, we apply what this court has referred to *(Madison v. Geier* (1965), 27 Wis. 2d 687, 135 N. W. 2d 761) as the middle burden of proof."

From the facts recited above, we conclude that the defendant herein is guilty of a very serious breach of the Code of Professional Responsibility. When the defendant drafted, explained and then signed as a party the loan agreement, he in effect represented three clients, Mr. Sundseth, Roadmaster and himself. He could not under these circumstances give to each the full and disinterested advice to which every client has a right. *Estate of O'Loughlin* (1971), 50 Wis. 2d 143, 150, 183 N. W. 2d 133; *State v. Horan* (1963), 21 Wis. 2d 66, 73, 123 N. W. 2d 488; Code of Professional Responsibility adopted by this court, 43 Wis. 2d lxxv (1970), and set out at 29 W. S. A., p. 567 et seq., sets a minimum standard of acceptable professional conduct in its disciplinary rules. Violation of these disciplinary rules is unprofessional conduct.[2] The rules prohibit an attorney from representing clients with interests adverse to each other where the dual representation may impair the lawyer's independent professional judgment on behalf of either. That prohibition extends to members of the lawyer's firm.[3]

---

[2] Sec. 256.29 (2), Stats.

[3] "DR 5-105 Refusing To Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance

The only exception to the prohibition is contained in section (C). To fall within this exception two criteria must be met. First, it must be obvious that the lawyer can adequately represent the interest of each client and second, each must consent to the representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each. Neither of these criteria were met in this case. Rather than being obvious that he could represent the adverse interests of Roadmaster and its principal officers as well as his other client, Mr. Sundseth, it was obvious that these adverse interests could not be represented by the defendant in a professional manner. This was proved by the chain of events that ensued following this multiple representation.

We also conclude that the defendant's participation in the loan under the circumstances of this case constituted an additional violation of the Code.[4] Certainly it should

of the proffered employment, except to the extent permitted under DR 5–105 (C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105 (C).

"(C) In the situations covered by DR 5–105 (A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

"(D) If a lawyer is required to decline employment or to withdraw from employment under DR 5–105, no partner or associate of his or his firm may accept or continue such employment."

[4] "DR 5–101 Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment.

"(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably

have been obvious in the beginning, and it became quite obvious as the affair progressed, that the defendant's own financial interest in Roadmaster was bound to affect the exercise of his professional judgment. This is nowhere better demonstrated than by the decision he made to seize the assets of his client in the writ of attachment action. The full disclosure that disciplinary rule DR 5–101 requires was certainly not given. Full disclosure here means more than merely telling the client that he was going to join Mr. Sundseth as a lendor. An informed consent requires disclosure which details not only the attorney's adverse interest, but also the effect it will have on the exercise of his professional judgment. For example here, the shaky condition of the client corporation was known to the attorney. Under the circumstances he should have told his client that as soon as he felt in any way jeopardized in the recovery of his loan, he would take steps to protect himself rather than to protect the interests of the client. Such a candid disclosure might have prompted Roadmaster to seek new counsel, and this would have been the proper result.

The basic conflict of interest here resulted in two specific instances where the defendant's attempt to protect his personal interest and that of his other client, Mr. Sundseth, involved him in further violation of the

may be affected by his own financial, business, property, or personal interests.

"DR 5–104 Limiting Business Relations with a Client.

"(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

"(B) Prior to conclusion of all aspects of the matter giving rise to his employment, a lawyer shall not enter into any arrangement or understanding with a client or a prospective client by which he acquires an interest in publication rights with respect to the subject matter of his employment or proposed employment."

disciplinary rules. The first concerned his commencement of legal proceedings in the form of attachment and the second concerned his confrontation with his former clients after they had retained other counsel and without the consent of such other counsel.

The record in this case demonstrates that the allegation contained in the affidavit that the defendant had good reason to believe that Roadmaster or Messrs. Entwistle and Miller intended to defraud their creditors was without any basis of fact. This was a violation of the disciplinary rule,[5] which simply stated, requires honesty. The basic question is whether or not the defendant had good reason to believe that his former clients were engaged in fraudulent transfers or attempted fraudulent transfers. The defendant's law clerk testified that he prepared the affidavit from a form book and that the only statutory ground he could find to justify attachment was such fear of fraudulent transfer. The defendant's justification for his contentions were default on loan payments, evasiveness by Mr. Miller as to where some trailers placed on consignment were in fact located, and outstanding loans to Roadmaster by others which allegedly received preferences in repayment. From all of the facts testified to, none of these expressed fears amounts to a reasonable belief that a fraudulent transfer of property was taking place or about to take place.

It is also clear that the defendant should not have had the confrontation with Messrs. Miller and Entwistle at the Roadmaster office after he knew that they had retained other counsel.[6]

---

[5] "DR 1–102 Misconduct.

"(A) A lawyer shall not:

". . .

"(r) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

[6] "DR 7–104 Communicating with One of Adverse Interest.

"(A) During the course of his representation of a client a lawyer shall not:

The referee in his first conclusion of law cited above found that the loan agreement wherein Roadmaster was to repay $103,000 for a $25,000 loan was "usurious and unconscionable." The issue of usury is the subject of the civil suit involving the parties to the loan agreement.[7] We note, however, that the complaint of the state did not charge usury and the state deemed it immaterial on appeal. Therefore we need not reach that legal issue in this disciplinary proceeding. However, we do agree with the referee that the loan by the defendant to his client calling for terms expected to benefit him at the rate of $500 per month for 78 months over and above repayment of principal and interest at ten and one-half percent interest was indeed unconscionable. The referee concluded that the defendant violated "Code EC-4." EC stands for "Ethical Considerations." In the preamble of the Code of Professional Responsibility as promulgated by the American Bar Association it states: "The Ethical Considerations are aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations. The Disciplinary Rules, unlike the Ethical Considerations, are mandatory in character. The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action . . . ." While not officially adopted as part of our Code of Professional Responsibility, we agree with the American Bar Association's Preamble statement in this respect. The proper citation for alleged violations of the Code of Professional Responsi-

"(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."

[7] *Sundseth v. Roadmaster Body Corp.*, 74 Wis. 2d 61, 245 N. W. 2d 919.

bility should be a reference to the Disciplinary Rule. This is reinforced by Wisconsin statute, 256.29 (2) which makes clear that it is a violation of the Disciplinary Rules that constitutes the violation of the Code of Professional Responsibility.

We agree with the referee that the state did not sustain the burden of proof required to find that the unsuccessful attempt by Roadmaster and its officers to sell the corporation to a Pennsylvania corporation was the result of the defendant's activities. We are satisfied as was the referee that the sale failed because the potential purchaser felt that Roadmaster had excessive liabilities, bad bookkeeping, poor workmanship and high salaries. We also agree with the referee that the state failed to meet its burden of proof on the charge that the defendant had offered Messrs. Miller and Entwistle $10,000 each "under the table" in exchange for turning over the assets of the company.

■ ■ This court has often said that the purpose of discipline is to protect the public. It is imposed in the public interest and to assure the moral fitness and the professional responsibility of everyone licensed to practice law in this state. *State v. Kondos* (1974), 66 Wis. 2d 119, 123, 224 N. W. 2d 211. Several members of the community testified as to the defendant's good moral character and his professional competence. This is material to the question of the severity of the discipline but not whether discipline should be imposed. *State v. Postorino, supra.* The referee noted that the defendant lost $5,000 in the transaction, that he had lost his association with a law firm, that he had received bad publicity and that he was a defendant in a malpractice action brought by Miller and Entwistle in concluding that discipline should be in the form of a "strong reprimand." We disagree. We conclude that the conduct here is of the type that merits severe discipline.

 It is ordered and adjudged that the defendant, Gilbert Sedor, be suspended from the practice of law in this state for a period of eight months from the entry of this order and for such period thereafter as shall expire before his license is restored. Restoration and reinstatement as a member of the state bar is conditioned upon the payment of costs of these proceedings to the clerk of this court not to exceed $5,000 and compliance with Rule 10, section 5 of the Rules of the State Bar of Wisconsin. The defendant may make application for reinstatement after the expiration of five months from the entry of this order.

It is further ordered that the State Bar of Wisconsin notify the courts of record of these orders by sending each a copy thereof.

It is further ordered that Gilbert D. Sedor notify his respective clients now represented by him in all matters involving the practice of law or all matters pending in any court of this state that his license to practice law in this state is now suspended.

ABRAHAMSON, J., took no part.