IN the MATTER OF the DISCIPLINARY PROCEEDINGS AGAINST Jack L. MARCUS & Jerome A. TEPPER, Attorneys at Law.

Supreme Court

*No. 80–259–D. Argued April 27, 1982.—Decided June 2, 1982.*
(Also reported in 320 N.W.2d 806.)

For the Board of Attorneys Professional Responsibility there were briefs and oral argument by *Robert H. Bichler,* of Racine.

For Jack Marcus there was a brief by *David A. Saichek, Theodore B. Hertel, Jr.,* and *Saichek & Hertel, S.C.,* of Milwaukee, and oral argument by *David A. Saichek.*

For Jerome Tepper there was a brief by *Robert E. Sutton* and oral argument by *Walter F. Kelly,* both of Milwaukee.

DAY, J. *Attorney disciplinary proceeding; complaint dismissed.*

This is an appeal by the Board of Attorneys Professional Responsibility (hereinafter Board) [1] from an order of the referee dismissing the complaints of professional misconduct filed against respondents Jack L. Marcus and Jerome A. Tepper (hereinafter respondents). [2] The

---

[1] The Board was created by an order of this court dated November 5, 1976, published at 74 Wis. 2d xi, codified, as amended, as SCR ch. 21. The Board is charged with the enforcement of the Code of Professional Responsibility and to protect the public from professional misconduct by attorneys.

[2] The conduct giving rise to the complaint was the publication of certain advertisements alleged to be in violation of Supreme Court rule governing lawyer advertising, contained in an order dated December 23, 1977, published at 81 Wis. 2d xxvii. The rule stated:

"For a one year period beginning January 1, 1978, a lawyer may advertise the lawyer's availability to provide legal services. It is

referee found that certain advertisements published on behalf of respondents did not create an overall impression that was false, misleading or deceptive and that the Board did not establish that any of the specific statements in the advertisements were false, misleading or deceptive and so dismissed the complaint on its merits. We affirm.

The first issue in this case is the allocation of the burden of proof when an attorney is charged with professional misconduct for publishing an advertisement which is allegedly "false, misleading or deceptive" in violation of the Code of Professional Responsibility. Respondents argue that the Board is required to establish that the ads in question were false, misleading or deceptive, while the Board urges that the burden is upon the attorneys who placed the ads to prove their veracity. We hold that the Board must bear the burden of proving that the ads are false, misleading or deceptive.

The second question is, were the ads "false, misleading or deceptive." The Board urges that they were, based on the contents of the ads, the proof submitted at hearing and from the court's knowledge of the practice of law. We agree with the referee that there is no showing that the ads were violative of the Code.

In 1978, respondents established a law firm under the name of Marcus and Tepper. Mr. Marcus is a 1967 graduate of Marquette University Law School who had not practiced law since his graduation. He was the principal investor in the firm and was in charge of advertising and finances. Mr. Tepper, a 1966 graduate of

professional misconduct for a lawyer to use any advertisement which is false, misleading or deceptive."

This rule is the predecessor of current SCR 20.08(7)(a), which reads:

"SCR 20.08, **Professional Notices, Letterheads, Officer and Law Lists.** . . . (7)(a) A lawyer may advertise the lawyer's availability to provide legal services except use of any advertisement which is false, misleading, deceptive or unfair is professional misconduct."

Marquette University Law School, who had been engaged in the active practice of law since his graduation, was responsible for the actual provision of legal services. The firm hired two recent law school graduates who worked under the supervision of Mr. Tepper. Linda Rothman, a graduate of Marquette University Law School, had no prior experience as an attorney but had served an internship in the Milwaukee County Corporation Office, where she had done supervised trial work, and had clerked for a Milwaukee law firm. Her primary responsibilities were client consultation and divorces. She worked under the supervision of Mr. Tepper, as did Jane Newby, a recent graduate of the University of Wisconsin Law School. Ms. Newby's primary responsibilities were in the areas of client counselling, preparation of wills and probating estates.

The firm attempted to develop a volume practice serving middle class clients. This was to be accomplished through the use of advertising and fixed fees. A fee schedule was established which set fixed fees for a number of legal matters, including adoption, bankruptcy, name change, uncontested divorce, real estate closing, will preparation and traffic offenses. For legal matters for which no fixed fee had been set, the firm would set a fee based upon the time which it estimated that the work would require, calculated at a rate of fifty dollars per hour. The firm bore the risk of underestimating the time required to perform the service and would not exceed the fee which it had set. The firm would also handle personal injury cases for a thirty percent contingency fee.

The advertisements which form the basis for this proceeding were published in the *Milwaukee Journal* and *Milwaukee Sentinel* from August through October, 1978. There were two different advertisements, both of which appeared as full page ads and in smaller versions.

The first ad, which will be referred to as the "meter ad," had a photograph of a taxi meter which registered

a fare of seventy nine dollars and forty-five cents, followed by several paragraphs of text.

The ad was subsequently modified to replace "high level of legal expertise" with "high level of professionalism;" "individual will" with "simple will;" and "average saving of one-half or more" with "average saving which is quite substantial."[3]

3

# HOW TO HIRE A LAWYER
# WITHOUT GETTING TAKEN FOR A RIDE.

Few things are as frustrating as retaining an attorney.

Because the minute you walk into their office the meter starts to run. And since the wheels of justice can turn exceedingly slow, your bill can start to spiral fast.

It isn't fair. But since lawyers traditionally charge by the hour, until recently you had little choice.

**Our lawyers practice what we preach.**

In all candor, we believe the high cost of justice today is anything but just.

We believe lawyers should be compensated on the basis of what they do. Not how long it takes them to do it. We believe clients should be told what their case is going to cost. Long before they receive a statement. And we believe that a good law firm can afford to charge inexpensive fees, and still be financially rewarding.

What's more, we're willing to put our beliefs into practice.

**Why other lawyers will hate this ad.**

When you come to Marcus and Tepper, the first thing you'll notice is the high level of professionalism. The second is our schedule of prices.

In most cases, fixed fees determined by the task at hand. Not by the hands of a clock. At an average saving of one-half, and more.

To be specific, our fee for an uncontested Divorce is $275. An Adoption is $150. And a simple Will is a mere $30. (Exclusive of normal court costs, of course.) And if you're buying a house, the closing cost is $100, regardless of the cost of the home. A saving quite substantial.

In short, anything a regular-priced lawyer does, Marcus and Tepper will do. And we'll do it for a good deal less.

**The more we do, the less we charge.**

If you're wondering how we can maintain such a high standard of work at such unstandard rates, there's a simple explanation.

Most lawyers are content to wait for unsolicited clients to come to them. So their clients have to pay for the time they spend waiting.

Not so with Marcus and Tepper.

We believe in aggressively advertising to generate a high volume of work. And staying open evenings and Saturdays to get it done.

And the more business we tend to do, the lower the price we can afford to charge. Which makes it more equitable for all.

Because when it comes to the law, your biggest legal problem shouldn't be your lawyer.

Copyright © September 1978
Marcus & Tepper Attorneys, Milwaukee, Wisconsin.
All rights reserved.

## Marcus & Tepper Attorneys At Law

5325 W. Burleigh, Milwaukee, Wis. 449-9700

Hours: Mon. and Thurs., 8:30 to 8 P.M.,
Tues., Wed. and Fri. 8:30 to 5 P.M.,
Saturdays until Noon.

The second ad, which will be referred to as the "hands tied" ad, showed a photograph of a rope around the wrists of two hands followed by several paragraphs of text.[4]

---

[4]

# WHEN IT COMES TO LOWERING THEIR PRICES, MOST LAWYERS' HANDS ARE TIED.

When it comes to lowering the prices they charge, most lawyers' hands are tied.

Their rent is high. Their volume is low. And their overhead is almost out of sight. Which means that when you retain a regular attorney, one way or another you're going to pay the price.

It isn't fair. But since law firms traditionally charge by time and expenses, it's little wonder they're so expensive.

**Are you paying for your law firm's mistakes?**

Simply put, we believe that one reason some lawyers' fees are so great, is because their overhead is so high.

We're smart enough to know that there's no way to keep your prices in check, when your expenses are way out of line. So before we ever opened our doors, we decided to open our eyes.

We took a look at the extra cost of downtown rents. We looked at the extravagance of client entertainment. And after we saw all the fancy desks and the overstuffed chairs, we knew how we could trim the rates. And trim our rates we did.

**Competent work at competitive prices.**

When you come to Marcus and Tepper, the first thing you'll find is a competent lawyer. The second is competitive prices.

In most cases, fixed fees determined by the task at hand. Not by the hands of a clock. At an average saving which is quite substantial.

To be specific, our fee for an uncontested Divorce is $275. An Adoption is $150. And a simple Will is a mere $30. (Exclusive of normal court costs, of course.) And if you're buying a house, the closing cost is $100, regardless of the cost of the home.

In short, anything a regular-priced lawyer does, Marcus and Tepper will do. And we'll do it for a good deal less.

**Why some lawyers are fit to be tied.**

If there's one thing some lawyers resent more than our reasonable rates, it's the way we promote them in full page ads. What's more they'd like to put an end to this practice.

At Marcus and Tepper, we strongly disagree.

We believe in aggressively advertising to generate a high volume of work. And staying open evenings and Saturdays to see it gets done.

And the more business we tend to do, the lower the price we can afford to charge. Which makes it more equitable for all.

After all, justice may be blind in the eyes of the law. But it's expensive in the hands of a lawyer.

Copyright © November 1978
Marcus & Tepper Attorneys, Milwaukee, Wisconsin.
All rights reserved.

## Marcus & Tepper Attorneys At Law

5325 W. Burleigh, Milwaukee, Wis. 449-9700

Hours: Mon. and Thurs., 8:30 until 8 PM;
Tues., Wed., and Fri., 8:30 to 5.
Saturday til Noon.

Several attorneys complained orally and in writing to persons associated with the Board and various bar associations that the ads were offensive. Following a preliminary investigation, the Board filed a complaint with this court charging respondents with professional misconduct for causing to be published a false, misleading and deceptive ad. This court appointed Hon. William C. Sachtjen, Reserve Judge, as referee. A hearing was held on May 26 and 27, 1981.

At that hearing, counsel for the Board introduced the ads and the fee schedule of the law firm. The Board's case consisted of the above documents, excerpts from answers to interrogatories and a deposition of Mr. Marcus, and the testimony of Mr. Tepper, who was called adversely.

The following evidence was adduced. The ads were formulated by Mr. Marcus and an advertising executive. Mr. Marcus based the statements in the ads on his law and business experience, and on conversations with other attorneys. He could not recall any specific sources of the information. Mr. Tepper reviewed the ads prior to their publication and approved them.

The Board introduced no other evidence. Two witnesses testified on behalf of respondents. The first was Professor Gerald Thain, a professor of law at the University of Wisconsin Law School. Professor Thain had been an attorney with the Federal Trade Commission whose responsibilities included review of advertising by national advertisers and making an initial determination as to whether the advertising was unfair or otherwise contrary to trade regulations. He has appeared twice before this court in connection with the adoption of rules governing attorney advertising. Professor Thain stated that "to a reasonable degree of advertising probability, the ads were not false, misleading or deceptive."

Respondents also called attorney James Brown, the director of the Center for Consumers Affairs in Milwaukee. Mr. Brown is president of the Wisconsin Consumers League and has served as a consumer representative on state bar committees. He stated that, based upon his experience as a Milwaukee attorney and consumer advocate, the ads were not "false, misleading or deceptive."

Mr. Tepper also testified, on his own behalf, that seventy-five to eighty percent of the firm's business was in the items listed in the ad and that those items did represent a fifty percent savings from the usual fees charged by attorneys for those services. He testified that he believed that the firm provided a high quality of representation, but that if he felt that a particular case called for expertise that the firm did not have, they would refer the case to outside counsel. Mr. Tepper also stated that, to his knowledge, no client had complained of the legal services provided by the firm.

Following the hearing the referee, Judge Sachtjen, issued a twenty-eight page report, containing findings of fact and conclusions of law, and ordered that the complaint be dismissed on its merits. The Board appealed to this court.

This is a case of first impression as to the issue of attorney advertising in this state. The Board urges us to interpret the rule governing attorney advertising so as to place upon attorneys the burden of proving the veracity of statements in advertisements which they cause to be published. Respondents argue that, in order to support a finding that they have engaged in professional misconduct, the Board must prove that the ads are false, misleading or deceptive. We first must determine who should bear the burden of establishing the truthfulness or lack thereof of the ad, and then determine wheth-

er the party upon whom the burden rests has sustained that burden.

The rule is a part of the Code of Professional Responsibility. Generally, in a disciplinary proceeding, the state has the burden of showing a violation of the Code of Professional Responsibility by clear and satisfactory evidence. *State v. Wildermuth,* 76 Wis. 2d 476, 481, 251 N.W.2d 779 (1977). The rule at issue does not explicitly allocate the burden of proof. The state argues that the traditional burden should be shifted in advertising cases because of the difficulty of enforcing the rule if the state must shoulder the burden. Furthermore, requiring attorneys to ascertain the truth of advertisements which they place is appropriate in light of attorneys' status as officers of the court.

Given a choice of reasonable interpretations of a rule, this court should select a construction which renders the rule constitutional. *Basinas v. State,* 104 Wis. 2d 539, 546, 312 N.W.2d 483 (1981) ; *State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 526, 261 N.W.2d 434 (1978). In *Bates v. State Bar of Arizona,* 433 U.S. 350 (1977), the United States Supreme Court ruled that in light of the first amendment guaranty of free speech, a state may not forbid the publication in newspapers of truthful information regarding the provision of legal services.

Prior to *Bates,* many states, including Wisconsin, had severely circumscribed the content and permissible placement of advertisements by attorneys.[5] The *Bates* case involved a newspaper advertisement placed by the Arizona law firm of Bates and O'Steen. The ad proclaimed

---

[5] *See,* ABA Canons of Professional Ethics No. 27; *State v. Willenson,* 20 Wis. 2d 519, 521–22, 123 N.W.2d 452 (1963) (per curiam). DR2–101 of the Code of Professional Responsibility (1969), adopted by order of the Wisconsin Supreme Court dated December 16, 1969, 43 Wis. 2d at xxii–xxiii, stated:

"Legal Services at Very Reasonable Rates," set forth set fees which the firm charged for certain services, such as uncontested divorces, adoptions, name changes and nonbusiness bankruptcies. The Arizona State Bar initiated disciplinary proceedings against Bates and O'Steen and, after a hearing, recommended that they be suspended from the practice of law for one week. Bates and O'Steen appealed to the Arizona Supreme Court, which upheld the ban on advertising, but reduced the discipline to a censure. Bates and O'Steen then petitioned for review in the United States Supreme Court, which granted their petition and overturned the Arizona Supreme Court decision.

The United States Supreme Court held that the severe restriction on the dissemination of information which was accomplished by the rule constituted a violation of the first amendment notwithstanding the substantial state interest in regulating attorney advertising. The United States Supreme Court also held that the specific statements in the advertisement constituted speech protected by the first amendment to the United States Constitution. 433 U.S. at 381–82.

The *Bates* decision did not explicitly allocate the burden of proof in disciplinary proceedings arising out of

"DR2–101 **Publicity in General.** (A) A lawyer shall not prepare, cause to be prepared, use, or participate in the use of, any form of public communication that contains professionally self-laudatory statements calculated to attract lay clients; as used herein, 'public communication' includes, but is not limited to, communication by means of television, radio, motion picture, newspaper, magazine, or book.

"(B) A lawyer shall not publicize himself, his partner, or associate as a lawyer through newspaper or magazine advertisements, radio or television announcements, display advertisements in city or telephone directories, or other means of commercial publicity, nor shall he authorize or permit others to do so in his behalf. . . ."

advertisements by attorneys. However, the following passage concerning the allegation that the ad was misleading because it did not disclose that a name change could be accomplished without an attorney implies that sufficient evidence must be introduced to support a finding that the advertisement is improper in order to justify discipline.

> *"The record does not unambiguously reveal some of the relevant facts in determining whether the nondisclosure is misleading,* such as how complicated the procedure is and whether the State provides assistance for laymen. The deposition of one appellant, however, reflects that when he ascertained that a name change required only the correction of a record or the like, he frequently would send the client to effect the change himself. App. 112.
> "We conclude that *it has not been demonstrated* that the advertisement at issue could be suppressed." 433 U.S. at 382 (Emphasis added.)

The United States Supreme Court recently clarified permissible scope of regulation of attorney advertising in *In the Matter of R.M.J.*, 455 U.S. ——, 71 L. Ed. 2d 64, 102 S. Ct. 929 (1982).[6] In that case, an attorney published advertisements which violated the Missouri Supreme Court Rules governing attorney advertising.[7] The

---

[6] In the period between *Bates* and *R.M.J.*, the United States Supreme Court issued two decisions concerning the extent to which states may regulate the direct solicitation of clients by attorneys. *In re Primus*, 436 U.S. 412 (1976), and *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447 (1978). These cases, although relevant to the general issue of first amendment restrictions on attorney conduct, are not germane to the case at hand, which involves mass media advertising rather than in-person solicitation. In *Ohralik*, the court held that an outright ban was an appropriate means of regulating in person solicitation even though this approach would not be appropriate to regulate media advertising because of the greater possibility of public scrutiny over advertising. 436 U.S. at 466–67.

[7] The rule allowed a lawyer to:

". . . 'publish . . . in newspapers, periodicals and the yellow pages of telephone directories' ten categories of information: name,

ads, which appeared in newspapers and the yellow pages of telephone books, listed areas of practice which were

address and telephone number; areas of practice; date and place of birth; schools attended; foreign language ability; office hours; fees for an initial consultation; availability of a schedule of fees; credit arrangements; and the fixed fee to be charged for certain specified 'routine' legal services; including . . . an uncontested dissolution of marriage; an uncontested adoption; an uncontested personal bankruptcy; an uncomplicated change of name; a simple warranty or quitclaim deed; a simple deed of trust; a simple promissory note; an individual Missouri or federal income tax return; a simple power of attorney; and a simple will. Vernon's Ann. Mo. Rules, Rule #4, DR2–101(b) (1981)."

An addendum to the rule provided:

"[T]he following areas for fields of law may be advertised by use of the specific language hereinafter set out:

"1. 'General Civil Practice'

"2. 'General Criminal Practice'

"3. 'General Civil and Criminal Practice.'

" 'If a lawyer or law firm uses one of the above, no other area can be used. . . . If one of the above is not used, then a lawyer or law firm can use one or more of the following:'

"1. 'Administrative Law'

"2. 'Anti-Trust Law'

"3. 'Appellate Practice'

"4. 'Bankruptcy'

"5. 'Commercial Law'

"6. 'Corporation Law and Business Organizations'

"7. 'Criminal Law'

"8. 'Eminent Domain Law'

"9. 'Environmental Law'

"10. 'Family Law'

"11. 'Financial Institution Law'

"12. 'Insurance Law'

"14. 'Labor Law'

"15. 'Local Government Law'

"16. 'Military Law'

"17. 'Probate and Trust Law'

"18. 'Property Law'

"19. 'Public Utility Law'

"20. 'Taxation Law'

"21. 'Tort Law'

"22. 'Trial Practice'

not among the categories permitted by the rule. The advertisement also failed to include a disclaimer of special expertise in those areas, as required by the rule, and stated that the attorney was "admitted to practice before the United States Supreme Court," which was not provided for in the rule.

The Advisory Committee of the Supreme Court of the State of Missouri, which was charged with enforcing the Code of Professional Responsibility in that state, charged the attorney with unprofessional conduct. The Missouri Supreme Court upheld the constitutionality of the rule and privately reprimanded the attorney. *In the Matter of R.M.J.,* 609 S.W.2d 411 (Mo. 1981). The attorney petitioned the United States Supreme Court for review of that decision. The United States Supreme Court granted that petition and, in a unanimous decision, reversed the Missouri Supreme Court.

The majority opinion, authored by Justice Powell, who had dissented in *Bates,* interpreted the holding of that case as follows:

"Thus, the Court has made clear in *Bates* and subsequent cases that regulations—and imposition of discipline—are permissible where the particular advertising is inherently likely to deceive or where the record indicates that a particular form or method of advertising has in fact been deceptive. . . .Commercial speech doctrine in the context of advertising for professional services, may be summarized generally as follows: Truthful advertising related to lawful activities is entitled to the protections of the First Amendment. But when the

"23. 'Workers Compensation Law.'
"No deviation from the above phraseology will be permitted and no statement of limitation of practice can be stated.
"If one or more of these specific areas of practice are used in any advertisement, the following statement must be included. . . . 'Listing of the above areas of practice does not indicate any certification of expertise therein.'" Rule 4, Addendum III (Adv. Comm. Nov. 13, 1977). 71 L. Ed. 2d at 68–69, 102 S. Ct. at 932–33.

particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the states may impose appropriate restrictions. Misleading advertising may be prohibited entirely. But the states may not place an absolute prohibition on certain types of potentially misleading information, e.g., a listing of areas of practice, if the information also may be presented in a way that is not deceptive. . . .Although the potential for deception and confusion is particularly strong in the context of advertising professional services, restrictions upon such advertising may be no broader than reasonably necessary to prevent the deception." 71 L. Ed. 2d at 73–74, 102 S. Ct. at 937.

The United States Supreme Court held that the Missouri rule constituted an "invalid restriction upon speech as applied to the appellant's advertisements." 71 L. Ed. 2d at 75, 102 S. Ct. at 938.

As in *Bates,* the United States Supreme Court did not explicitly state which party bore the burden of proving that the advertisements warranted discipline. However, the United States Supreme Court did state that "the listing published by the appellant *has not been shown to be misleading."* 71 L. Ed. 2d at 75, 102 S. Ct. at 939. (Emphasis added.) The following discussion of the portion of the ad which proclaimed the attorney's admission to practice before the United States Supreme Court also indicates that the burden is to be borne by the state.

"Somewhat more troubling is appellant's listing, in large boldface type, that he was a member of the bar of the Supreme Court of the United States. See Appendix A. The emphasis of this relatively uninformative fact is at least bad taste. Indeed, such a statement could be misleading to the general public unfamiliar with the requirements of admission to the bar of this Court. Yet *there is no finding to this effect by the Missouri Supreme Court. There is nothing in the record to indicate that the inclusion of this information was misleading.*

Nor does the Rule specifically identify this information as potentially misleading or, for example, place a limitation on type size or require a statement explaining the nature of the Supreme Court bar." 71 L. Ed. 2d at 76, 102 S. Ct. at 938–39 (Emphasis added.)

The conclusion of the opinion again emphasized the absence of a finding that the ad was misleading.

"In sum, none of three restrictions in the Rule upon appellant's First Amendment rights can be sustained in the circumstances of this case. *There is no finding that appellant's speech was misleading.* Nor can we say that it was inherently misleading, or that restrictions short of an absolute prohibition would not have sufficed to cure any possible deception. We emphasize, as we have throughout the opinion, that the States retain the authority to regulate advertising that is inherently misleading or that has proven to be misleading in practice. There may be other substantial state interests as well that will support carefully drawn restrictions. But although the states may regulate commercial speech, the First and Fourteenth Amendments require that they do so with care and in a manner no more extensive than reasonably necessary to further substantial interests. The absolute prohibition on appellant's speech, *in the absence of a finding that his speech was misleading,* does not meet these requirements." 71 L. Ed. 2d at 76–77, 102 S. Ct. at 939. (Emphasis added.)

In light of *R.M.J.,* we interpret SCR 20.08 (7) (a) and its predecessor as requiring the party which is seeking to have discipline imposed to bear the burden of proving by clear and satisfactory evidence that the advertisement violates the rule. This is consistent with the burden of proof in attorney disciplinary proceedings generally. It is also consistent with United States Supreme Court decisions concerning the constitutionality of regulations governing attorney advertising.

The Board asks this court to require attorneys to prove the truthfulness of statements contained in advertise-

ments. As authority for this proposition, they cite three cases concerning advertising under the Federal Trade Act.[8] The most recent of those cases was decided in 1965, which was over a decade before the United States Supreme Court held, in *Virginia Pharmacy Board v. Virginia Consumers Council*, 425 U.S. 748 (1976), that commercial speech was entitled to some protection under the first amendment to the United States Constitution. As such, those cases are not persuasive authority for allocating the burden of proof to the attorney insofar as that allocation is based upon first amendment considerations. The cases also did not require the advertiser to prove the truthfulness of the statements in the ads, but merely held that the Federal Trade Commission, as the finder of fact, could find that the ads were inherently misleading solely from the content of the ads. Those cases do not provide authority for shifting the burden of proof onto the advertising attorney.

We cannot say that the ads in question are inherently misleading. The argument as to whether fixed fees or time charges best serve the public interest is a matter about which reasonable minds may differ.

The referee found that the ads did not create an overall impression which was false, misleading or deceptive. He further found that the Board had not established that any of the statements in the ad were false, misleading or deceptive. In a disciplinary action, this court examines the record *de novo* to determine whether discipline is warranted. *State v. Wildermuth*, 76 Wis. 2d 476, 481, 251 N.W.2d 779 (1977); *Matter of Proceedings Against Sedor*, 73 Wis. 2d 629, 636–37, 245 N.W.2d 895 (1976). However, the recommendations of the referee, who con-

---

[8] *Double Eagle Lubricants, Inc. v. F.T.C.*, 360 F.2d 268, 270 (10th Cir. 1965); *Zenith Radio Corp. v. F.T.C.*, 143 F.2d 29, 31 (7th Cir. 1944); *In re Papercraft Corp.*, 63 F.T.C. 1965 (1963).

ducted the hearing and observed the witnesses, are given consideration. *Matter of Proceedings Against Sedor,* 73 Wis. 2d at 637; *State v. Preston,* 38 Wis. 2d 582, 588c, 157 N.W.2d 615, 159 N.W.2d 684 (1968), *cert. den.* 393 U.S. 981 (1968). We have carefully examined the record and have reached the same conclusion as the referee. The advertisements do not warrant imposing discipline upon respondents.

The ads are not on their face misleading. They express a belief that the fees charged by many attorneys are higher than necessary, and that this is, at least in part, due to high overhead, inefficiency, and the practice of charging by the hour. The ads also list the fees which the firm charged for particular legal services, and expressed a belief that those fees represented an average saving of at least one-half. The ads also state that the firm possesses a "high level of legal expertise."

Aside from the ads, the only evidence introduced by the Board in support of its contention that the ads were false, misleading or deceptive, was testimony by Mr. Tepper. He stated that the firm would take certain cases for a thirty percent contingency fee and that the charge for types of legal services for which fixed fees had not been set were based on a rate of fifty dollars per hour. Mr. Tepper conceded that the contingency fee and hourly rate did not represent a savings of one-half compared to fees commonly charged in Milwaukee but stated that, because the vast majority of the firm's work consisted of the routine services for which fixed fees had been set, he still believed that, on the average, the firm's clients realized a savings of one-half or more.

The Board also elicited testimony from Mr. Tepper, and introduced statements by Mr. Marcus taken during discovery proceedings, as to the expertise of the attorneys employed by the firm. This evidence established that, aside from Mr. Tepper, who was an experienced attorney,

the members of the firm had very little experience practicing law. This was apparently offered to refute the statement in the ad that "[W]hen you come to Marcus and Tepper, the first thing you'll notice is the high level of legal expertise."

The Board did not offer any proof that any client had been charged more than the advertised fees, that clients did not realize an average savings of one-half; that attorneys did not generally charge by the hour; or that the firm did not possess a "high level of legal expertise."

We find that the ads are not, on their face, inherently misleading. This conclusion is supported by the testimony of Professor Thain, who said that the ads were not "false, misleading or deceptive" and that this type of advertising should be encouraged rather than prosecuted.

The testimony of Attorney James Brown, who has been active in the area of "consumer law" and practiced law in Milwaukee, also supports this conclusion. Mr. Brown stated that, in his opinion, the ads were not "false, misleading or deceptive" and that the fees set forth in the ad may very well have represented a fifty percent savings for the firm's clients. Mr. Brown also stated that, if properly supervised, recent law school graduates could provide a high level of legal expertise.

Furthermore, the Board presented no evidence whatsoever that any clients of the firm or members of the lay public were deceived by the ads or considered the allegations therein "false, misleading or deceptive." As Judge Sachtjen stated:

"The Board offered no proof that any clients complained concerning the level of representation which they received, or the prices charged. Nor was any proof offered which would tend to show that any client or the clients in general received less than a high level of legal expertise in the handling of their legal matters."

We have found nothing in the record which disputes this conclusion.

Respondent Marcus asks this court to hold that respondents are entitled to recover reasonable attorneys fees and expenses from the Board. We decline to do so. The parameters of the permissible scope of regulation of attorney advertising are still in flux. The Board, a public agency charged by this court with the responsibility of enforcing the Code of Professional Responsibility, brought this action and has convinced some members of this court that the ads did constitute misconduct. We find nothing in the record to indicate that this action was commenced out of malice or frivolity. Neither is such an award authorized by the rules governing disciplinary proceedings. We hold that respondents are not entitled to costs and reasonable attorneys fees.

In summary, we conclude that the advertisements do not constitute professional misconduct. Upon a review of the advertisements, and in light of the evidence introduced at the disciplinary hearings, we find that the advertisements are not inherently "false, misleading or deceptive." We further conclude that the Board has not proved, by clear and satisfactory evidence, that any of the statements in the ad were false, misleading or deceptive. Finally, we hold that respondents are not entitled to recover their expenses and reasonable attorneys fees from the Board.

It is therefore ordered that the complaint against Jack L. Marcus and Jerome A. Tepper, be dismissed on its merits.

BEILFUSS, C. J. *(concurring)*. I agree with the majority that the record does not establish that the questioned ads of Marcus and Tepper were false, misleading or deceptive, which were the standards adopted by this

court after the decision of the United States Supreme Court in *Bates v. State Bar of Arizona,* 433 U.S. 350 (1977), and in effect at the time the ads were published. The rule as it now exists contains the additional prohibition of unfairness[1] which, of course, is not tested in this proceeding.

These ads are understandably offensive to many respected and ethical members of the bar, and in all probability would have been considered unethical prior to the decisions of the United States Supreme Court in *Bates v. State Bar of Arizona, supra,* and *In the Matter of R.M.J.,* 455 U.S. ——, 102 S. Ct. 929, 71 L. Ed. 2d 64 (1982).

I believe these ads were degrading and lack the sense of professionalism we should expect of lawyers. However, those characterizations are not sufficient to prohibit them.

STEINMETZ, J. *(dissenting).* I disagree with the decision of the court.

Some of the most unfortunate and ill-chosen words used in the history of the United States Supreme Court were those of Justice Blackmun in *Bates v. State Bar of Arizona,* 433 U.S. 350, 371–72 (1977), when he wrote:

"In this day, we do not belittle the person who earns his living by the strength of his arm or the force of his mind. Since the belief that lawyers are somehow 'above' trade has become an anachronism, the historical foundation for the advertising restraint has crumbled."

The Random House Dictionary of the English Language (1966), defines anachronism as "after its own time; an obsolete or archaic form. . . ."

It is true, we do today pay proper respect to the person who serves society by the use of his strength or mechanical aptitude. However, that is a societal judgment

---

[1] SCR 20.08(7).

and attitude toward individuals and their worth. This same judgment of individuals cannot be likened to society's judgment of a group practicing the profession of law.

The individual in our society has been and always should be judged as such; however, when he or she is a member of a profession, a mantle of the group is placed on that person. This mantle can be referred to collectively as our "profession." The entire profession is judged by the actions of individual members.

The language of Justice Blackmun has been interpreted by the attorneys arguing the instant case to mean that the profession of law is no longer entitled to a distinctive recognition, but is rather the equivalent of an individual's trade and the bar association mentality is equivalent to a "guild mentality."

According to Webster's Third New International Dictionary (1967), a guild is:

"1: an association of men belonging to the same class, engaged in kindred pursuits, or having common interests or aims: as a: any of various medieval associations having both social and semireligious features b: a medieval association of merchants controlling local trade in some parts of Britain and sometimes constituting the local governing body c: a medieval association of members of a craft or trade established to promote the welfare of that craft and its members and sometimes replacing the merchants' guild as a governing body d: any of various modern associations, societies, or brotherhoods resembling medieval guilds in their aims . . . *broadly:* FELLOW-SHIP, SOCIETY . . . ."

That definition hardly describes an integrated bar association where membership of men and women is required, and the only common purposes are improvement in the representation afforded to society and protection against persons in the group whose conduct is less than professional.

The previously quoted words of Justice Blackmun may have led to the type of argument made in this case. However, later in his opinion Justice Blackmun charged the bar association and its individual members with guarding the public against deceptive advertising of attorneys in assuring "that advertising by attorneys flows both freely and clearly."

Justice Blackmun also stated: "We suspect that, with advertising, most lawyers will behave as they always have: They will abide by their solemn oaths *to uphold the integrity and honor of their profession and of the legal system. Bates v. State Bar of Arizona, supra,* at 379. (Emphasis added.)

Thus, within one opinion Justice Blackmun hints that attorneys may be tradesmen and later recognizes that they are professionals bound by their solemn oath. This latter characterization is consistent with the case of *In the Matter of R. M. J.,* 455 U.S. ——, 102 S. Ct. 929, 71 L. Ed. 2d 64 (1982), in which the court stated: "Thus, in *Bates,* the Court found that the potentially adverse effect of advertising on *professionalism* and the quality of legal services was not sufficiently related to a substantial state interest to justify so great an interference with speech." *R. M. J., supra,* 102 S. Ct. at 938. (Emphasis added.)

"Profession" is relevantly defined in The Random House Dictionary of the English Language as "a vocation requiring knowledge of some department of learning or science: . . . *Cf. learned profession."* (Emphasis added.)

"Learned profession" in the same book is defined as follows: "one of the three vocations of theology, law, and medicine, commonly held to require highly advanced learning, high principles, etc. . . ."

Perhaps we are so modernized in our attitude of sameness of individuals that the "learned" can be dropped;

however, we still must recognize that the practice of law is a profession and not a trade.

A "trade" is defined in the same source book as "any occupation pursued as a business or livelihood . . . some line of skilled manual or mechanical work; craft. . . ." The references are to business endeavors as distinguished from service and also suggest employment of primarily physical skills.

When the oath administered to attorneys entering the practice of law in Wisconsin (sec. 757.29, Stats.) is examined, it obviously does not reflect a mere participation or interest in commerce, but rather the rendering of a professional service. The oath is not appropriate for an individual who earns his or her livelihood by engaging in a commercial trade. The oath reads:

"757.29 **Attorneys regulated.** (1) ATTORNEY'S OATH. Each person admitted to practice as a member of the bar of any court of this state shall subscribe the roll of attorneys to be kept by the clerk and shall in open court take an oath or affirmation of the tenor following, to wit: I do solemnly swear:

"I will support the constitution of the United States and the constitution of the state of Wisconsin;

"I will maintain the respect due to courts of justice and judicial officers;

"I will not counsel or maintain any suit or proceeding which shall appear to me to be unjust, or any defense, except such as I believe to be honestly debatable under the law of the land;

"I will employ, for the purpose of maintaining the causes confided to me, such means only as are consistent with truth and honor, and will never seek to mislead the judge or jury by any artifice or false statement of fact or law;

"I will maintain the confidence and preserve inviolate the secrets of my client and will accept no compensation in connection with my client's business except from my client or with my client's knowledge and approval;

"I will abstain from all offensive personality and advance no fact prejudicial to the honor or reputation of a

party or witness, unless required by the justice of the cause with which I am charged;

"I will never reject, from any consideration personal to myself, the cause of the defenseless or oppressed, or delay any person's cause for lucre or malice. So help me God."

If the highest court in our land treats the "learned profession" of law as a trade, this attitude will fill our ranks with tradespeople, rather than professionals.

Justice Powell referred to the recognition accorded the legal profession in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 792 (1975) : "The interest of the States in regulating lawyers is especially great since lawyers are *essential* to the primary governmental function of administering justice, and have historically been 'officers of the courts.'" (Emphasis added.) This was also quoted in *Bates, supra,* at 361. *See also: Sperry v. Florida,* 373 U.S. 379, 383 (1963) ; *Cohen v. Hurley,* 366 U.S. 117, 123–24 (1961) ; *Law Students Research Council v. Wadmond,* 401 U.S. 154, 157 (1971).

The *Bates* case in allowing attorney advertising placed limits on this form of commercial free speech. The court explained the need for such limitation: "Because the public lacks sophistication in legal matters, it may be particularly susceptible to misleading or deceptive advertising by lawyers." *Bates, supra,* at 379.

*Bates* further held at 383:

"In holding that advertising by attorneys may not be subjected to blanket suppression, and that the advertisement at issue is protected, we, of course, do not hold that advertising by attorneys may not be regulated in any way. . . .

"Advertising that is false, deceptive, or misleading of course is subject to restraint. See *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S., at 771–772, and n. 24. . . . In fact, because the public lacks sophistication concerning legal services, misstatements that

might be overlooked or deemed unimportant in other advertising may be found quite inappropriate in legal advertising."

In the case of *In the Matter of R. M. J.*, the court in discussing *Bates* held: "But the decision in *Bates* nevertheless was a narrow one. The Court emphasized that advertising by lawyers still could be regulated. False, deceptive, or misleading advertising remains subject to restraint, and the Court recognized that advertising by the professions poses special risks of deception—. . . ." *R. M. J., supra,* 102 S. Ct. at 935–36.

The Supreme Court in *R. M. J.* stated *Bates* "did not by any means foreclose restrictions on *potentially* or *demonstrably* misleading advertising." 102 S. Ct. at 937. (Emphasis added.)

The states have a legitimate interest in controlling professional services advertising, and it was made clear in *Bates* and *R. M. J.*, "that regulation—and imposition of discipline—are permissible where the particular advertising is inherently *likely to deceive* or where the record indicates that a particular form or method of advertising has *in fact been deceptive.*" *R. M. J., supra,* 102 S. Ct. at 937. (Emphasis added.)

I would hold that the advertising of Marcus and Tepper was misleading in fact and, certainly, inherently likely to deceive. I would hold that though the advertising was directed toward the legitimate end of attracting clients, it was unprofessional and misleading. The question is who must be misled for the action to constitute unprofessional conduct, and the answer is the public, of course, not other attorneys. The attorneys who complained about the advertising in the present case were encouraged to be guardians of the integrity of their profession by the U.S. Supreme Court in *Bates* and subsequent cases for the very reason that the public is often unsophisticated in evaluating the accuracy of statements made in profes-

sional advertising. Certainly, the corporation executive would not be likely, without further knowledge or investigation, to contact the lawyers with the taximeter or bound wrists for legal services, but the less informed person in need of legal advice or services, such as discussed in *Bates,* might very well be attracted due to the misleading qualities of the ads.

The ads were placed in *The Milwaukee Journal* and the *Milwaukee Sentinal* with statewide circulation and yet the professed purpose was to attract clients in the Milwaukee area where the law office was located. The material of the ads was supposedly directed to urban residents, but it reached all readers of the papers. However, the major claims contained in the advertising had to do with offices of attorneys located in high overhead areas of downtown Milwaukee complete with their alleged extravagance and overstuffed chairs. The total idea presented is misleading and calls upon prejudices that may be held by consumers. Prejudice is not based on facts, but relies on all-inclusive characterizations being made about a group due to the isolated actions of a few.

As anyone with specific knowledge of the practice of law knows, attorneys' fees are not "mostly" set at an hourly rate as indicated in the ad. That is only one fee method. There are various ways of setting fees, depending on the particular nature of the work and the client involved:

(1) flat fee,

(2) contingency fee,

(3) hourly rate,

(4) pro bono.

The amount an attorney charges also depends on training, knowledge, time and expertise, and those considerations are necessarily involved in determining the method of fee computation appropriate to the case.

The advertising attorneys in this case variously applied the fee charge appropriate to the nature of the case the same as those described above.

The ads in this case state the "minute you walk into their office the meter starts to run. And since the wheels of justice can turn exceedingly slow, your bill can start to spiral fast." In one misleading statement two prejudices are appealed to; first, justice in this prospective client's case will be the one where "justice can turn exceeding slow," and, secondly, the same client's case will automatically be subject to an hourly charge. This is a misleading and deceptive statement without any realistic or proven basis in fact. This deception is furthered by the large picture of a taximeter, which is not related to the practice of law, but rather to a common commercial experience of consumers. The appeal is crass, misleading and unprofessional and should be censured.

Lawyers do not "traditionally charge by the hour." Some lawyers may do so for certain cases, but the ad uses the all-inclusive term of "lawyers," and this creates an inaccurate and misleading impression.

The ad opines that "the high cost of justice today is anything but just." This is misleading, since the total text of the ad suggests attorneys' fees are the sole cause of the high cost, if such "unjust" expenses even exist. There is no empirical justification for this accusation; it denigrates the legal profession, and it is misleading.

The ad suggests a saving of one-half and more as an average. There is no justification for this statement, and verification of the figure is impossible. It is a misleading statement and a simplistic appeal to the unsophisticated consumers of legal services who possess a natural desire to shop for the best bargain. However, since it is a claim without substance, it is an emotional and deceptive ploy.

Finally, the ad suggests the client's biggest legal problem may be the client's lawyer. This also is a prejudice-

oriented statement which is misleading and without foundation.

The other ad, picturing bound wrists, is sensationalistic and attention-getting, but more importantly, it is also unprofessional.

This ad also refers to the overhead of attorneys as being "out of sight." That statement is particularly misleading when applied generally to attorneys throughout the state, and not just to the "downtown firm" referred to in the ad.

The claim is also made that the volume of cases of "most lawyers" is low. Such a foundationless generalization cannot be made without being deceptive and misleading to the consumer.

To refer to the "extravagance of client entertainment" and "fancy desks and the overstuffed chairs" is again an appeal to prejudice. It is posited without any established knowledge, and is inflammatorily and deceptively unprofessional.

The concern in this case is not how the firm treated the matter in terms of fee once the client was in the office, but rather whether the ads were deceptive and misleading in attracting the client to the office.

The attorneys in this case have by their advertising diminished the professionalism of the practice of law. Their crass commercialism, if uncensured, negates the high level of professionalism which has been established through years of efforts and which is still practiced by the vast majority of attorneys.

Without a doubt, professional pride and integrity are the hallmarks which distinguish the true lawyer from one who merely practices law. A truly professional lawyer has a compelling sense of pride in the profession and a demanding, uncompromising sense of integrity.

The standards to be applied to attorney advertising are presently uncertain and without previously established

590

definition, and, therefore, the advertising in this case should not serve the example of acceptable, though minimally permissible conduct. The profession of law in its relationship to the public deserves higher standards.

Since the test of fairness has now been added to the standards, the ads under consideration in this case would certainly be unethical. I do find, however, that these ads were misleading and deceptive and, therefore, unprofessional under the code as it existed at that time.

I am authorized to state that Mr. JUSTICE WILLIAM G. CALLOW and Mr. JUSTICE LOUIS J. CECI join in this dissent.