STATE OF NEBRASKA EX REL. NEBRASKA STATE BAR ASSOCIATION, RELATOR, V. JOHN M. THOR, RESPONDENT.

467 N.W.2d 666

Filed April 5, 1991.   No. 89-830.

Paul Schumacher for relator.

David A. Domina, of Domina & Copple, P.C., for respondent.

HASTINGS, C.J., BOSLAUGH, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

This is an original action brought by the Counsel for Discipline against a member of the Nebraska State Bar Association, John M. Thor, respondent. The respondent has been charged with violating Canon 1, DR 1-102, and Canon 5, DR 5-103 and DR 5-104, of the Code of Professional Responsibility.

The referee, Noyes W. Rogers, determined that the respondent had violated DR 1-102. The referee further concluded that the respondent had not violated DR 5-103 and DR 5-104. The referee recommended a suspension from the practice of law for 30 days. Both the relator and the respondent filed exceptions with this court.

A proceeding to discipline an attorney is a trial de novo on the record, in which the Supreme Court reaches a conclusion independent of the findings of the referee, provided, where credible evidence is in conflict on a material issue of fact, the Supreme Court considers and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another. *State ex rel. NSBA v. Douglas*, 227 Neb. 1, 416 N.W.2d 515 (1987), *cert. denied* 488 U.S. 802, 109 S. Ct. 31, 102 L. Ed. 2d 10 (1988); *State ex rel. NSBA v. Rhodes*, 234 Neb. 799, 453 N.W.2d 73 (1990); *State ex rel. NSBA v. Kirshen*, 232 Neb. 445, 441 N.W.2d 161 (1989). "In its de novo review of the record in a disciplinary proceeding against an attorney, and to sustain a particular complaint against an attorney, the Supreme Court must find that the complaint has been established by clear and convincing evidence." *Douglas, supra* at 8, 416 N.W.2d at 521; *Rhodes, supra*; *Kirshen, supra*.

Amended formal charges were filed against the respondent in this court on August 9, 1989, alleging that the respondent had violated DR 1-102(A)(1), (4), (5), and (6); DR 5-103(A)(1) and (2); and DR 5-104(A). Respondent was also charged with violating Neb. Rev. Stat. § 7-104 (Reissue 1987).

The referee appointed by this court, Rogers, held a formal hearing on the amended formal charges on February 26, 1990, and filed his report with this court on July 20, 1990. The referee found that the respondent had violated DR 1-102(A)(4). The

referee also found that the relator had not proven violations of DR 5-103 and DR 5-104 by clear and convincing evidence. The referee recommended that respondent be suspended from the practice of law for 30 days. The respondent has filed exceptions to the report of the referee, and the matter is now before this court for review.

The respondent was admitted to the practice of law in 1973. Since his admission to the bar, the respondent has engaged in the general practice of law in the Wisner, Nebraska, area. Five character witnesses, three attorneys and two laypersons, testified on behalf of the respondent at the hearing. These witnesses testified that the respondent was an honest man and a very capable attorney. Furthermore, over 50 attorneys wrote letters in support of Thor, stating generally that Thor is an honest and capable attorney.

The allegations in the amended formal charges center on a transaction for the purchase of 151 acres of real estate by respondent from his clients, Marilyn and Leon Rathke.

In early 1986, Thor was retained by the Rathkes, who were experiencing financial difficulty. The Rathkes had defaulted on a loan and mortgage held by Prudential Insurance Company (Prudential). During the time respondent represented the Rathkes in connection with the Prudential matter, the respondent expressed some interest in the land mortgaged to Prudential, but he did not purchase the land. The land was deeded over to Prudential in lieu of foreclosure and deficiency judgment. This transaction is not the subject of the complaint.

In early 1987, the First National Bank of Beemer, Nebraska, informed Mr. Rathke that it would no longer give him an operating loan, which he needed to continue farming. Mr. Rathke sought Thor's assistance in dealing with the Beemer Bank. At this same time the Rathkes were indebted to The Federal Land Bank and Farmers Home Administration (FmHA). The Rathkes' indebtedness was far in excess of the value of their assets and was secured by mortgages on the real estate and security interests in the personal property.

The Rathkes' financial situation made it obvious that bankruptcy was the only solution. The only consideration was whether to choose chapter 7 bankruptcy, liquidation, or chapter

12 bankruptcy, farm reorganization. The alternative chosen would affect their future tremendously because it would decide if the Rathkes would ever farm again.

The respondent explained both a chapter 7 and a chapter 12 bankruptcy to the Rathkes. The respondent advised Mr. Rathke that in a chapter 7 bankruptcy, a homestead exemption of $10,000 is available. The respondent further informed Mr. Rathke that annuities could be purchased which would be exempt in a chapter 7 bankruptcy.

Chapter 12 bankruptcy was a relatively new form of bankruptcy geared toward the family farmer. See 11 U.S.C. ch. 12 (1988). A chapter 12 bankruptcy involves reorganization. The financially distressed farmers could purchase back their assets from the secured creditors at the assets' fair market value; however, the farmers needed to have an operating plan confirmed which illustrated that they would have adequate cash-flow to service the debt at the fair market value. Thus, the basic question in utilizing a chapter 12 bankruptcy was whether the farming operations could produce a sufficient cash-flow to meet operating expenses and to make the necessary payments on the debt at the fair market value of the secured assets.

Chapter 12 bankruptcy had only been available for a few months at the time the Rathkes contacted the respondent about their financial difficulties. The respondent attended seminars given by the Nebraska Bankers Association and by Bankruptcy Judge Timothy Mahoney and U.S. chapter 12 Trustee Richard Lydick to prepare himself for representing clients who wished to use chapter 12 bankruptcy. The respondent used one of the outlines from these seminars as an interview tool to inform clients about chapter 12 bankruptcy.

The respondent went through some calculations to determine if the Rathkes could make a chapter 12 bankruptcy work. These calculations are contained in the record as exhibit 46. The figures indicate a large annual payment would be necessary to make the plan work. The respondent was convinced that these payments could not be made.

The Rathkes could not farm in the spring of 1987 because they did not have any operating capital. Mr. Rathke obtained a job in Platte Center, Nebraska, to pay for living expenses. On

May 29, 1987, the Rathkes purchased a home in Columbus, Nebraska. The Rathkes did this to utilize the homestead exemption under a chapter 7 bankruptcy; however, they had not yet decided whether they would be filing a chapter 7 or a chapter 12 bankruptcy.

The respondent consistently recommended a chapter 7 bankruptcy to the Rathkes. The respondent also recommended that the Rathkes get a second opinion with respect to the bankruptcy option. The Rathkes did seek a second opinion from another attorney, Charles Wagner. Mr. Rathke admitted that Wagner gave them the same information about the types of bankruptcy. Wagner also advised them that they would qualify for a chapter 12 bankruptcy.

Wagner told the Rathkes that annuities could be purchased in a chapter 7 bankruptcy and that these annuities would be exempt, but that the law was going to change on August 27, 1987. The respondent's interest in acquiring the 151 acres was not discussed at this meeting. The respondent had not yet expressed a serious interest in the real estate at this time.

The Rathkes returned to respondent, who once again recommended a chapter 7 bankruptcy. The Rathkes decided to follow the respondent's advice and file chapter 7 bankruptcy and, further, to do so before the law changed so that they could take advantage of the unlimited annuities. On July 15, 1987, Mr. Rathke visited with the respondent and informed the respondent that he and his wife wished to file a chapter 7 bankruptcy.

The respondent had represented only one other family farmer in a chapter 12 bankruptcy at this time, the Rabes. He represented the Rabes on a limited basis, engaging other attorneys to do a significant amount of the bankruptcy work. The Rabes had encouraged the respondent to purchase their farm and lease it back to them. The respondent declined to purchase the farm, testifying that he did so because he realized that the Rabes wanted to continue farming. However, the respondent realized that the Rabes needed a center pivot to make their plan work, so he purchased the irrigation system from the secured creditor and leased the irrigation system back to the Rabes at terms which were favorable to the Rabes. The

respondent stated that he remained cocounsel for the Rabes, but he permitted other attorneys to prepare the chapter 12 plan.

On August 1, 1987, the respondent encouraged the Rathkes to list the 151 acres with Thor Realty, which was also a client of the respondent's and owned by the respondent's father. The Rathkes signed an exclusive listing agreement which obligated Thor Realty to use its best efforts to obtain a buyer for the 151 acres in exchange for a 5-percent commission. The land was listed with Thor Realty at a price of $1,060 per acre. The Rathkes were interested in avoiding a foreclosure sale. The real estate was listed in an attempt to pacify The Federal Land Bank. The respondent testified that he informed the Rathkes of the possible conflict of interest, since Thor Realty was also a client, but did not inform them of such in writing. Mr. Rathke testified that the respondent did not advise him of the potential conflict of interest.

Thor Realty personnel never visited the farm, sent any prospective purchasers to view the farm, or advertised the farm for sale. Thor Realty did take a 5-percent commission when the farm was purchased by the respondent.

The Federal Land Bank held the first mortgage on the 151 acres and the FmHA held the second mortgage. The Federal Land Bank had indicated that the FmHA had the financial interest in the sale price of the 151 acres because the sale price would adequately cover the first mortgage.

The respondent expressed an interest sometime in August 1987 in purchasing the 151 acres. On August 21, 1987, the respondent offered $130,000 to the FmHA for the 151 acres, about $860 per acre. The respondent did not at this time nor at any time disclose to the FmHA that he was making the offer on his own behalf. The offer was rejected, but this set into motion the appraisal process. Once an offer is made, the FmHA has the property appraised to determine the minimum price it will accept per acre. The land was appraised at $1,100 per acre. This price was disclosed to Thor because he was the Rathkes' attorney. The Rathkes filed a chapter 7 liquidation bankruptcy action on August 26, 1987. This ensured that the annuities they had the respondent purchase would be exempt. The 151 acres were listed on the bankruptcy schedule at a value of $900 per

acre.

The respondent was contacted by John Wisnieski, who was interested in purchasing the 151 acres. He informed Wisnieski that the property was not yet for sale and might possibly be involved in the bankruptcy proceedings for some time. Wisnieski requested that the respondent notify him when the property was for sale. Wisnieski was also in the real estate business and wanted to list the property. However, sometime during the fall of 1987, he told the respondent that he would pay $1,500 per acre for the property. Wisnieski was quite definite in saying that he absolutely made an offer to purchase at that price.

There was also testimony from farmers from the area that the land was good farmland. Land across the road from the 151 acres had sold for $1,090 per acre in 1987. This land was not nearly as good as the Rathkes'. The testimony indicates that the Rathkes' land was irrigated, while the land across the road was not. Further, the Rathkes' land did not have water from other land running across it, while the other property did. These farmers testified that they would have bid on the land or purchased the land had they known it was for sale.

The respondent never informed the Rathkes, the bankruptcy court, or the secured creditors of the interest expressed by farmers in the area. In fact, the respondent requested the Rathkes refer anyone interested in the property to him. The respondent told the Rathkes that they should keep everything quiet and not give anyone information about the property. This was documented in a letter dated September 15, 1987, which instructed the Rathkes to refer all parties interested in purchasing the land to him and explicitly stated, "If anyone makes any inquiries concerning the land, please advise them to contact this office. Do not advise or tell them anything that is transpiring."

The Rathkes assumed that the respondent was looking after their best interests in instructing them, and thus they never pursued any of the other prospects. The respondent denied that this paragraph dealt with the sale of the property; rather, he testified that the paragraph dealt with the "CRP payments."

On August 20, 1987, the respondent advised Mr. Rathke that

he was giving serious consideration to purchasing the real estate. On October 12, 1987, the respondent contacted Mr. Rathke and stated that he was willing to purchase the land. The respondent sent a letter dated October 12, 1987, to the FmHA relaying a $1,100-per-acre offer, but did not disclose the identity of the purchaser.

On October 13, 1987, the respondent and the Rathkes attended the first meeting of creditors in bankruptcy court. The U.S. bankruptcy trustee, Richard Myers, abandoned the Rathkes' land, evidently because it was too heavily encumbered with secured debt for the trustee to attempt to sell the land and retain any of the proceeds for the unsecured creditors. The abandonment was filed on October 15, 1987. Mr. Rathke testified that he was present on October 13, 1987, when the trustee announced that he would abandon the land.

Prior to the first meeting of creditors, the respondent had prepared two contracts to purchase the land. One identified Charles Dake as the purchaser and the other identified the respondent as the purchaser.

After the first meeting of creditors was over, the Rathkes and the respondent went to have coffee and rolls and to discuss the events of the morning, as well as the sale of the land. The respondent showed the Rathkes the two contracts and went over the details of the contracts. The Rathkes and the respondent then went to a law office in Omaha to have the contracts signed and notarized. The respondent testified that he told the Rathkes that if they wanted to discuss the contracts with an attorney at the law office they could. The Rathkes did not consult with an attorney at that law office.

The respondent testified that he was using Dake for two reasons. First, he wanted his identity hidden from the public because he wanted to avoid talk in his small community. Second, he wanted to sell real estate he owned in Pierce County, Nebraska, or trade it in a tax-free exchange. Mr. Rathke testified that the respondent told him that Dake was being used to protect the transaction. The Rathkes further testified that the respondent never mentioned that he had to sell any land or trade any land to facilitate the transaction.

In December 1987, the sale documents were signed, the sale

transaction was closed, and the respondent went into possession of the property. Thor asked the person who picked up and listed the filings not to publish the conveyance in the newspaper. Apparently this is not an unusual request.

Thor Realty received the 5-percent commission for the sale of the property. There was some dispute before the commission was granted because the FmHA did not feel that Thor Realty had earned its commission. The FmHA did eventually pay the commission, but not before the transaction had closed and it learned that the respondent was the real purchaser. The FmHA county supervisor, Donald Kampschneider, testified that the identity of the purchaser did not make a difference as long as the minimum purchase price was paid. The respondent also received payment for preparing the documents necessary to sell the property.

Thomas D. Lambert, a licensed appraiser, was retained by the respondent to appraise the land for the purposes of the disciplinary proceedings. The land was appraised as of the day the respondent acquired an interest in it, October 13, 1987. Lambert valued the land at $1,050 per acre.

The respondent assigns as error the referee's determination that the respondent violated DR 1-102. The respondent further assigns as error the referee's recommendation that the respondent be suspended from the practice of law for 30 days.

Relator submits that the referee erred in finding that the respondent did not violate DR 5-103 and DR 5-104, and in recommending only a 30-day suspension.

The basic issues in a disciplinary proceeding against an attorney are whether discipline should be imposed and, if so, the type of discipline appropriate under the circumstances. *State ex rel. NSBA v. Douglas*, 227 Neb. 1, 416 N.W.2d 515 (1987); *State ex rel. NSBA v. Rhodes*, 234 Neb. 799, 453 N.W.2d 73 (1990); *State ex rel. NSBA v. Kirshen*, 232 Neb. 445, 441 N.W.2d 161 (1989).

The general purpose of the Nebraska Code of Professional Responsibility is to encourage and develop the conscience and ethics of lawyers in their professional and private lives so that the institution of the law merits and receives the respect and trust of the public. *State v. Douglas*, 217 Neb. 199, 349 N.W.2d

870 (1984). When an attorney takes an oath and receives a license to practice law, the attorney swears that established standards of professional ethics will be observed and, further, submits to the implied understandings that the attorney's conduct will be proper and that the attorney will abstain from practices that discredit the attorney, the courts, and the profession. *State ex rel. NSBA v. Neumeister*, 234 Neb. 47, 449 N.W.2d 17 (1989); *State ex rel. NSBA v. Hahn*, 218 Neb. 508, 356 N.W.2d 885 (1984). There is a presumption of the attorney's innocence in a disciplinary proceeding. *State ex rel. NSBA v. Kelly*, 221 Neb. 8, 374 N.W.2d 833 (1985).

The purpose of a disciplinary proceeding is not so much to punish an attorney as it is to determine, in the public interest, whether the attorney should be permitted to continue to practice law. *State ex rel. NSBA v. Douglas, supra*; *Rhodes, supra*. Violation of a disciplinary rule concerning the practice of law is a ground for discipline. *State ex rel. NSBA v. Douglas, supra*; *Neumeister, supra*.

The Counsel for Discipline alleges that the actions of the respondent in the real estate transaction between the respondent and the Rathkes were a violation of the respondent's oath as an attorney licensed to practice law in the State of Nebraska, as provided in § 7-104, and were a violation of the Code of Professional Responsibility, to wit:

DR 1-102 Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

. . . .

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

. . . .

DR 5-103 Avoiding Acquisition of Interest in Litigation.

(A) A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client, except that he may:

(1) Acquire a lien granted by law to secure his fee or expenses.

(2) Contract with a client for a reasonable contingent fee in a civil case.

. . . .

DR 5-104 Limiting Business Relations with a Client.

(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

We discuss first the alleged violation of the oath. The alleged violation of DR 5-103(A)(1) and (2) will be reviewed second. Next, the alleged violation of DR 5-104(A) will be discussed. Finally, the alleged violation of DR 1-102(A)(1), (4), (5), and (6) will be considered.

Section 7-104 states:

Every attorney upon being duly admitted to practice in the Supreme Court or district courts of this state, shall take and subscribe an oath substantially in the following form: You do solemnly swear that you will support the Constitution of the United States, and the Constitution of this state, and that you will faithfully discharge the duties of an attorney and counselor, according to the best of your ability.

The respondent violated his duties as an attorney and as a counselor when he entered into a contract to purchase land from his clients while failing to disclose his conflict of interest. A violation of the Nebraska Code of Professional Responsibility would be a violation of the oath. We analyze the alleged violations.

The respondent has been charged with the acquisition of property which was the subject of litigation. The respondent purchased property which had been abandoned by the trustee. The property was abandoned during the first meeting of creditors on October 13, 1987, after the trustee concluded that the secured interest was well in excess of the value of the real estate. The respondent acquired an interest in the property that same day.

The respondent negotiated for the purchase while the property was still in litigation. He technically did not acquire an interest in the property until after the property was abandoned by the trustee.

The order for the meeting of creditors provided:

> WITHIN 21 DAYS AFTER THE 341(a) MEETING, the Trustee will file with the Court a list of property to be abandoned. If no objections to the list is [sic] filed within 10 days after the 21 day dealine [sic], the property will be deemed abandoned without further action by the court.

The relator argues that this paragraph makes the real estate the subject of litigation for 10 days following the filing of the list of abandoned property, which in turn must be filed within 21 days of the meeting of creditors. The order abandoning the property was filed October 15, 1987, 2 days after the hearing. Thus, the property remained the subject of litigation for the 10 days following the order. At any time a creditor could have objected to the abandonment of the property and a hearing would have had to take place to determine if the property was burdensome to the estate. Although there were no objections to the abandonment, the property remained the subject of litigation until the time for objections to the abandonment had passed. Therefore, the respondent violated DR 5-103 when he acquired an interest in the property from the Rathkes.

The next allegation concerns the violation of DR 5-104(A), which limits business relations with clients. The Iowa Supreme Court stated in the case *Committee on Prof. Ethics, etc. v. Mershon*, 316 N.W.2d 895, 899 (Iowa 1982):

> Because of the fiduciary relationship which exists, the attorney "has the burden of showing that the transaction 'was in all respects fairly and equitably conducted; that he fully and faithfully discharged all his duties to his client, not only by refraining from any misrepresentation or concealment of any material fact, but by active diligence to see that his client was fully informed of the nature and effect of the transaction proposed and of his own rights and interests in the subject matter involved, and by seeing to it that his client either has independent advice in the matter or else receives from the attorney such advice as the

latter would have expected to give had the transaction been one between his client and a stranger.' ''

Thus, to establish a violation of DR 5-104(A), it is necessary to show (1) that the attorney and client had differing interests in the transaction, (2) that the client expected the lawyer to exercise his professional judgment for the protection of the client, and (3) that the client consented to the transaction without full disclosure. *Mershon, supra.*

The first element which must be proved to show a DR 5-104(A) violation is differing interests. "Differing interests" are interests that are "conflicting, inconsistent, diverse, or otherwise discordant." See Canon 5, EC 5-14, of the Code of Professional Responsibility.

In *City of Hastings v. Jerry Spady Pontiac-Cadillac, Inc.*, 212 Neb. 137, 322 N.W.2d 369 (1982), the court held that it was fundamental law that an attorney representing a client must not knowingly do anything which is inconsistent with the terms of his employment or contrary to the best interests of his client. In that case, the attorney for the city purchased property he knew the city was interested in, without disclosing his interest in the land. Although that case was not a disciplinary proceeding, the principle of conflict of interest is the same.

When the Rathkes filed a chapter 7 bankruptcy, the property became property of the bankruptcy estate. The Rathkes no longer had an interest in the property. However, once the property was abandoned by the trustee, the property reverted back to the Rathkes. In *In re Roberts*, 460 F. Supp. 88 (N.D. Ga. 1978), the court held that after abandonment of land by the trustee, the bankrupt holds title in the same manner as if title had never been in the trustee. See, also, *Barletta v. Tedeschi*, 121 Bankr. 669 (N.D.N.Y. 1990) (holding that once the trustee knowingly and properly abandons the property of the estate, the abandonment is irrevocable and the title vests in the debtor in the same manner as before bankruptcy); *In re Strelsky*, 46 Bankr. 178 (E.D. Va. 1985) (concluding that title vests in the bankrupt in the same manner as title was held prior to bankruptcy). Thus, the Rathkes held title to the land in the same manner as it was before bankruptcy.

The respondent alleges that the FmHA was the real party of

interest in selling the land because the Rathkes would not receive any proceeds from the sale. The property of the Rathkes was heavily encumbered. The value of the secured interest in the real estate was far in excess of the purchase price. The proceeds from the sale of land would not be enough to cover the debt of the secured creditors, and thus the Rathkes would not receive any money from the sale. However, the Rathkes did have an interest in the real estate, an interest that was in conflict with the interest of the respondent. The Rathkes could choose whether to let the land be foreclosed by the FmHA or to enter into a voluntary sale. This clearly is something of interest to the Rathkes.

The respondent wished to purchase the Rathkes' land. As a purchaser, the respondent was interested in purchasing the land at the lowest possible price. The Rathkes, as sellers of the land, were interested in obtaining the highest possible price. In fact, Mr. Rathke testified that he wanted to see the land bring as much money as possible as a matter of pride and to make sure the creditors were not left "holding the bag." The Rathkes had been leaders in their community for years and wanted to pay off as many debts as possible. The more money the land brought, the more it would help their creditors.

The contrary interests of the respondent and the Rathkes were further evidenced by a letter written to the Rathkes. In the letter, the respondent informed the Rathkes that the FmHA did not want to pay the commission to Thor Realty for selling the 151 acres. The respondent continued in his letter, stating, "If it was not for my interest in the land, I would tell him to take a hike."

The interest of the respondent as purchaser and the interest of the Rathkes as sellers are clearly in conflict. This conflict prevented the respondent from giving the Rathkes the full and disinterested advice to which each client is entitled. The respondent's own interest in the real estate was bound to affect the exercise of his professional judgment.

The second element that must be established is that the client expected the attorney to exercise his professional judgment. The respondent testified that he advised the Rathkes to seek another attorney's advice with regard to the sale of the land.

This was not documented by a letter or even a memo to the file. The Rathkes testified that the respondent did not advise them to seek another attorney's advice and in fact did not even inform them that there was a possible conflict of interest.

The Rathkes had retained the respondent to assist them with their financial problems. They expected the respondent to assist them so that their financial problems were handled in such a way as to benefit them and not unnecessarily harm the creditors. They relied on the respondent's advice. In return, they expected the respondent to exercise his professional judgment in helping them out of their financial difficulty.

Finally, the bar must show that the client consented to the transaction without a full disclosure. A full disclosure is necessary when there is a conflict of interest between the attorney and the client. The client must be advised that there is a conflict of interest. The client must also be informed of the possible areas that this conflict of interest may affect. The respondent makes much of the fact that at all times the Rathkes knew that he was the party that was going to purchase the property. This is not full disclosure and does not relieve the respondent of his duty to inform the Rathkes of the effect the conflict of interest might have on his representation of the Rathkes.

In the case *Matter of Proceedings Against Sedor*, 73 Wis. 2d 629, 245 N.W.2d 895 (1976), the Wisconsin Supreme Court stated that full disclosure meant more than telling the client, a corporation, that the attorney was joining another shareholder, who was also a client, as a lender. Any consent given to such transaction was not informed consent. The court stated that an informed consent required disclosure of both the existence of the conflict of interest and the effect that conflict would have on the exercise of the attorney's professional judgment. The attorney in that case was suspended from the practice of law for 8 months.

In *State ex rel. Neb. State Bar Assn. v. Nelson*, 147 Neb. 131, 22 N.W.2d 425 (1946), this court stated that an attorney may not represent adverse parties with conflicting interests except by express consent of all concerned, given after a full disclosure of all the facts. This clearly did not happen in the case at bar. The

only fact disclosed to the Rathkes was that the respondent was the purchaser. Facts which remained undisclosed to the Rathkes were that others were interested in purchasing the property and these people were interested in paying more for the property than the respondent. Other undisclosed items were the effects of the conflicts of interest on the respondent's representation of the Rathkes, both the conflict in purchasing the land and the conflict in recommending another client as a realtor.

After reviewing the testimony and evidence, we find that it is clear respondent violated DR 5-104(A). First, the respondent had a conflict of interest with the Rathkes, his clients. Second, the Rathkes depended on the respondent to look after their best interests and to exercise his professional judgment in his role as their attorney. Finally, the Rathkes consented to the transaction with the respondent without a full disclosure. In entering into this transaction with the Rathkes, the respondent failed to limit his business relations with a client. Furthermore, the respondent failed to disclose to the Rathkes the nature of his interest and how that would affect his role as their attorney.

The final allegation is that the respondent is guilty of misconduct. The respondent's actions with regard to the real estate transaction involved dishonesty, fraud, misrepresentation, and deceit. The respondent did not disclose his interest in purchasing the property to the FmHA and in fact went to great lengths to conceal that fact.

The conduct that is in question is the active and intentional attempts by the respondent to restrict or limit anyone else from bidding on the Rathkes' property. The respondent did so by having the Rathkes list the property with his father's real estate firm, which firm made no effort to advertise or promote the sale of the farm to the public. The respondent also urged the Rathkes not to disclose that the farm would be sold in the near future. Further, the respondent informed people who made inquiries into the property that the property would not be sold for some time. Finally, during this same time, the respondent was actively pursuing the purchase at a lower price, concealing his identity, and in fact did purchase the property at the minimum price at which the FmHA would sell the property.

The respondent was using his position as attorney handling

the Rathkes' bankruptcy litigation to obtain knowledge and the inside track in his purchase of the property out of the bankruptcy estate, while excluding everyone else from having the opportunity to make offers. At the very least, the respondent was misleading the public to believe that the land would not be available for some time and thus discouraged several interested purchasers.

The respondent was so obsessed with secrecy to protect the transaction, he used a strawman to effectuate the purchase. In addition, he prevented the transaction from being published in the local newspaper.

In *State ex rel. NSBA v. Douglas*, 227 Neb. 1, 24, 416 N.W.2d 515, 530 (1987), the court stated that " '[a]n affirmative statement is not always required, however, and fraud may also consist of the omission or concealment of a material fact if accompanied by the intent to deceive under circumstances which create the opportunity and duty to speak.' " The court continued, stating that "conceal" means to " 'hide, secrete, or withhold from knowledge of others . . . .' " *Id.* at 25, 416 N.W.2d at 530, quoting *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987). The court further stated that " 'the word *conceal* pertains to affirmative action likely to prevent or intended to prevent knowledge of a fact . . . .' " *Id.*

In the case *Committee on Prof. Ethics, etc. v. Baker*, 269 N.W.2d 463 (Iowa 1978), an attorney purchased property in another's name when he knew the seller was a client and further knew that the offer was well below market value. He also told another purchaser that the farm was already sold when it really was not. The attorney's license to practice law was revoked for violations of DR 5-104(A) and DR 1-102(A)(1) to (6).

The respondent concealed facts from the Rathkes. These facts are set out above. His concealment amounted to fraud and misrepresentation, in violation of DR 1-102(A)(4). Furthermore, by violating disciplinary rules, the respondent has violated DR 1-102(A)(1).

The final issue is the appropriate discipline. In determining the appropriate discipline, consideration is given to the nature of the offense, the need for deterring others, the maintenance of the reputation of the bar as a whole, the protection of the

public, the attitude of the offender generally, and his or her present or future fitness to continue in the practice of law. *State ex rel. NSBA v. Neumeister*, 234 Neb. 47, 449 N.W.2d 17 (1989); *State ex rel. NSBA v. Rhodes*, 234 Neb. 799, 453 N.W.2d 73 (1990); *State ex rel. NSBA v. Kirshen*, 232 Neb. 445, 441 N.W.2d 161 (1989).

The respondent has violated several disciplinary rules. In so doing, he has harmed the image of the legal profession. The appearance of impropriety, at the very least, is quite evident. Clients walked into his office looking for assistance in a financial crisis. The clients left his representation 1 year later, after paying a substantial fee, with the respondent owning a choice piece of the clients' real estate.

The respondent may actually have paid the fair market value as appraised by the FmHA and the independent appraiser hired for the trial; however, this does not excuse his conduct. The respondent concealed from the public the fact that he was purchasing the property. The respondent concealed from the Rathkes the fact that a higher offer had been made on the property. Also, the respondent concealed the effect of his conflict of interest from the Rathkes.

Conduct such as that which has been displayed by the respondent should be discouraged. The conduct has brought doubt into the minds of many as to the competence of the legal profession to represent a client's best interests. For this reason, something more than a reprimand is required. However, the respondent has exhibited great remorse for his conduct. Furthermore, the respondent was very diligent in seeking a workout for the respondents before the bankruptcy was filed. His competence as an attorney does not appear to be in question. Thus, disbarment is not necessary.

In determining the appropriate discipline, it is necessary to review other Nebraska cases dealing with disciplinary proceedings. In *State ex rel. NSBA v. Roubicek*, 225 Neb. 509, 406 N.W.2d 644 (1987), the attorney falsified estate tax records. The actions of the attorney did not benefit the attorney financially. This court stated that disbarment was not appropriate and suspended the attorney from the practice of law for 2 years.

*State ex rel. NSBA v. Addison*, 226 Neb. 585, 412 N.W.2d 855 (1987), involved an attorney who fraudulently misrepresented that only two insurance policies were involved when there were actually three. The attorney was suspended for 6 months.

*State ex. rel. NSBA v. Neumeister, supra*, was a case in which the respondent violated the advocate-witness rule. The attorney showed no remorse for his violation. This court suspended the attorney for 1 year.

In *State ex rel. NSBA v. Douglas*, 227 Neb. 1, 416 N.W.2d 515 (1987), Douglas, the Attorney General, had a duty to make a full and truthful disclosure to the interested state officials concerning the nature of his conflict. Douglas did not disclose the nature of the conflict. This court stated that "[h]is silence was a clear violation of the Code requiring disclosure, without regard to whether or not the outcome of pending or future official investigations would have been changed, and was tantamount to a false representation that there was no conflict." *Id*. at 61, 416 N.W.2d at 549. Douglas was suspended for 4 years.

From another jurisdiction, in *Conduct of L.B. Sandblast*, 210 Or. 65, 307 P.2d 532 (1957), the attorney of the administrator of an estate purchased property without telling anyone he was purchasing the property. None of the clients suffered any injury as a result of this. The court stated that the relationship existing between an attorney and a client is a sacred trust. The attorney was suspended for 1 year.

The attorney in *State ex rel. Nebraska State Bar Assn. v. McArthur*, 212 Neb. 815, 326 N.W.2d 173 (1982), was suspended for a period of 1 year. He had filed a final report in an estate proceeding representing that the deceased died possessed of an interest in specific property, and as a consequence the county court signed an order of discharge assigning the property in accordance with the will. As a matter of fact, the property had been sold some 2¹/₂ years earlier. Although the record failed to disclose that any specifically delineated injuries or other losses occurred as a consequence of that dereliction, this court nevertheless concluded that the attorney had acted in a lazily slipshod manner and had failed to

deal completely and honestly with the facts as they were known to him.

The facts in this case show that by his silence, Thor had failed to deal completely and honestly with the facts as they were known to him, had deliberately covered up some facts, and had not acted in the complete interest of his clients.

We conclude that the appropriate discipline in this case is suspension from the practice of law for a period of 1 year, commencing April 15, 1991. Costs of this proceeding are taxed to the respondent.

JUDGMENT OF SUSPENSION.

WHITE, J., not participating.